T.C. Memo. 2002-280

UNITED STATES TAX COURT

E. CAROLYN MELLEN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4962-01.                    Filed November 7, 2002.

<u>W. Kevin Jackson</u>, for petitioner.

<u>R. Craig Schneider</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  This case arises from a request for

equitable relief under section 6015(f)[1] with respect to

petitioner's taxable year 1995.  We must decide whether respon-

---

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect at all relevant times, and
all Rule references are to the Tax Court Rules of Practice and
Procedure.

dent abused respondent's discretion in denying petitioner relief under that section for that year. We hold that respondent did not abuse respondent's discretion.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.[2]

At the time the petition was filed, petitioner resided in Salt Lake City, Utah.

Petitioner and Craig Richard Mellen (Mr. Mellen), who married in 1970, have five children--Jamie, Rick, Andrea, Andrew, and Justin--and one grandchild, Jessica, who is Jamie's daughter. At the time of the trial in this case, those children and that grandchild were 32, 28, 26, 25, 23, and 14 years old, respectively.

After petitioner graduated from high school in 1959, she completed a one-year course of study at Henagers Business College, where she took courses in business, shorthand, and English. After completing that course of study in 1960, petitioner became employed, first as a medical claims clerk and then as a secretary. In 1970, when petitioner and Mr. Mellen had their first child, petitioner stopped working and remained unemployed until 1988, when she accepted a part-time position with Salt Lake

---

[2]Unless otherwise indicated or stated for clarity, all findings of fact and conclusions herein that do not indicate the times thereof pertain to the time of the trial in this case that took place on May 14, 2002.

Community College.

Since 1989, Questar InfoComm (Questar) has employed petitioner as a secretary, for which she received the following compensation during the years indicated:

| Year | Compensation[1] |
|------|----------------|
| 1994 | $19,788.11 |
| 1995 | 22,691.49 |
| 1996 | [2] |
| 1997 | 25,791.07 |
| 1998 | 28,529.83 |
| 1999 | 33,783.53 |
| 2000 | 33,800.81 |
| 2001 | 31,963.39 |

[1]State income tax, but no Federal income tax, was withheld from the compensation that petitioner received from Questar during 1994 and 1995. Federal income tax and State income tax were withheld from the compensation that petitioner received from Questar during 1997, 1998, 1999, 2000, and 2001.

[2]The record does not disclose the amount of petitioner's compensation from Questar during 1996, nor whether any Federal income tax or State income tax was withheld from that compensation.

At the time of the trial in this case, petitioner's annual compensation from Questar was $38,160.

At all relevant times, petitioner's employment with Questar provided her, inter alia, certain health and dental benefits as well as life and accident insurance and the right to participate in a retirement plan (Questar retirement plan). Petitioner contributed the following amounts to the Questar retirement plan during the years indicated:

| Year | Amount Contributed |
|------|--------------------|
| 1994 | $1,329.15 |
| 1995 | 1,502.82 |
| 1996 | [1] |
| 1997 | 1,713.93 |
| 1998 | 1,891.32 |
| 1999 | 2,224.62 |
| 2000 | 1,763.05 |
| 2001 | 2,050.00 |

[1]The record does not disclose the amount, if any, that petitioner contributed to the Questar retirement plan during 1996.

As of March 2002, petitioner's monthly contribution to the Questar retirement plan was approximately $191, which Questar was deducting from her compensation.

After reducing petitioner's annual compensation from Questar, as reported in Form W-2, Wage and Tax Statement, for each of the years 1994, 1995, and 1997 through 2001, by amounts, if any, for Federal income tax, State income tax, Social Security tax, Medicare tax, the cost of certain group-term life insurance, and contributions to the Questar retirement plan that were withheld from such compensation, petitioner's annual net compensation from Questar (petitioner's annual net compensation) for each such year was $16,735.37, $19,143.07, $21,474.13, $23,634.42, $27,168.47, $25,412.16, and $23,851.05, respectively.

At least as of the time of the trial in this case, petitioner was investing $50 a month in a mutual fund and had a balance in that mutual fund of $500. At least as of March 2002,

petitioner was investing approximately $8 each month, which Questar was deducting from her compensation each month, or approximately $100 each year in savings bonds.[3]

In April 1999, petitioner underwent surgery for colon cancer. In June 1999, petitioner again underwent surgery because petitioner's cancer had spread to her liver. Thereafter, petitioner has had regular checkups to monitor her recovery from cancer.

After graduating from high school around 1959, Mr. Mellen, who is dyslexic, worked as a roofer. At least as early as 1990, Mr. Mellen became engaged in certain activities as an inventor and sometime before 1995 was successful with respect to one of his inventions.

On July 15, 1994, Mr. Mellen was injured in an explosion (July 15, 1994 accident). Some of his property was also damaged or destroyed in that explosion. At all relevant times, peti-

---

[3]In addition to the amounts that we have already found Questar was deducting from petitioner's compensation as of March 2002, Questar was deducting as of that time the following approximate amounts each month from petitioner's compensation: (1) $140 for Federal income tax, (2) $113 for State income tax, (3) $186 for Social Security tax, (4) $43 for Medicare tax, (5) $96 for health benefits, (6) $30 for dental benefits, (7) $60 for reserved parking, (8) $52 for life insurance, (9) $5 for accident insurance, (10) $300 for a $14,000 debt owed to the State of Utah for State income tax with respect to taxable year 1995, (11) $17 for a legal service plan, (12) $168 payment on a loan from the Questar retirement plan, (13) $173 payment on a second loan from the Questar retirement plan, and (14) $77 for a "Micro Computer 1" (the meaning of "Micro Computer 1" is not disclosed by the record).

tioner knew about the July 15, 1994 accident as well as the injuries that Mr. Mellen suffered and the damage or destruction to his property caused by that accident.

In a letter dated June 10, 1997, the Social Security Administration (SSA) determined that Mr. Mellen was disabled, that his disability arose as of October 30, 1996, and that he satisfied the medical requirements for Social Security disability benefits (SS disability benefits). Sometime after June 10, 1997, the SSA determined that Mr. Mellen satisfied the nonmedical requirements for SS disability benefits and that he was entitled to such benefits as of April 1997. At a time not disclosed by the record, the SSA also determined that Mr. Mellen was entitled to hospital insurance under Medicare as of April 1999.

From at least March 1999 to the time of the trial in this case, Mr. Mellen received monthly SS disability benefits that ranged from approximately $900 to $949.

At times that are not disclosed by the record, petitioner and Mr. Mellen jointly filed Form 1040, U.S. Individual Income Tax Return (return), for each of the taxable years 1986 through 1991.

Sometime after October 15, 1996, but before October 23, 1996, petitioner and Mr. Mellen jointly filed a return for each

of the taxable years 1994 (1994 joint return)[4] and 1995 (1995 joint return).[5]

At times that are not disclosed by the record, petitioner prepared, without the aid of a paid return preparer, and filed returns using married filing separate status for the taxable years 1992, 1993, and 1996 through 2000, respectively. Sometime between September 28, 2001, and April 18, 2002, petitioner prepared, without the aid of a paid return preparer, a return using head of household status for taxable year 2001 (2001 return), but did not sign or file that return.[6]

The 1994 joint return reported, inter alia, adjusted gross income of $19,815, taxable income of $0, compensation of $19,788 that petitioner received from Questar, taxable interest income of $2, and dividend income of $25.

The 1995 joint return reported, inter alia, adjusted gross income of $355,340, taxable income of $315,704, compensation of $22,691 that petitioner received from Questar, taxable interest

---

[4]Petitioner and Mr. Mellen applied for and received extensions until Oct. 15, 1995, within which to file the 1994 joint return.

[5]Petitioner and Mr. Mellen applied for and received extensions until Oct. 15, 1996, within which to file the 1995 joint return.

[6]In the 2001 return, petitioner claimed Schedule A itemized deductions of $3,051 for State and local income taxes, $3,106 for real estate tax, $150 for personal property tax, $691 for mortgage interest, $3,775 for gifts to charity, and $3,000 for attorney and accounting fees.

income of $35 from Cyprus Credit Union, dividend income of $19,152,[7] and Schedule D capital gain of $500,755 from the sale of certain stock.[8]  The 1995 joint return claimed deductions for Schedule A itemized deductions of $39,636, a Schedule C loss of $127,219 relating to Mr. Mellen's activities as an inventor, a Schedule E loss of $29,144, and a casualty loss of $30,930 as a result of the July 15, 1994 accident that caused damage to, or destruction of, property that petitioner and Mr. Mellen claimed Mr. Mellen used in his business (claimed casualty loss deduction).

The Schedule A itemized deductions in the 1995 joint return were for claimed State and local income taxes of $147, real estate tax of $2,424, personal property tax of $100, mortgage interest of $6,979, and gifts to charity of $37,205.  Schedule A of the 1995 joint return listed $0 as the amount of medical expenses for which petitioner and Mr. Mellen were not reimbursed by insurance.

The 1995 joint return showed total Federal income tax of $79,467 and such tax due of $2,838.  Petitioner and Mr. Mellen

---

[7]Schedule B, Interest and Dividend Income, Part II, of the 1995 joint return listed Questar among the payors of gross dividends and/or other distributions on stock.

[8]In arriving at Schedule D capital gain of $500,755, petitioner and Mr. Mellen showed in Schedule D of their 1995 joint return gains and losses from the sales of stock in the following: "USPN", "IRC", "FONR", "CWIDE", "NHT", "NAM", and "SYBASE".

did not pay any Federal income tax at the time they filed the 1995 joint return. By February 3, 1997, petitioner and Mr. Mellen paid in full the Federal income tax due shown in that return, a penalty, and interest thereon.

Sometime during 1997, an agent of respondent (examining agent) commenced an examination of the 1995 joint return (respondent's examination). Sometime after that examination commenced but before September 8, 1998, the examining agent proposed nine adjustments (proposed adjustments) to the 1995 joint return, which included the proposed disallowance of the claimed casualty loss deduction of $30,930. As grounds for that proposed disallowance, the examining agent concluded that if the alleged casualty occurred at all, it occurred during 1994. Sometime after the examining agent proposed those adjustments but before September 8, 1998, petitioner and Mr. Mellen disagreed with the proposed adjustments and requested and had a conference with the Internal Revenue Service (IRS) Appeals Office. During that conference, the IRS Appeals Office sustained only one of the adjustments proposed by the examining agent, namely, the proposed disallowance of the claimed casualty loss deduction.

On September 8, 1998, petitioner and Mr. Mellen signed Form 870, Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment, in which they agreed to the disallowance of the claimed casualty loss deduction

for their taxable year 1995 and to the immediate assessment and collection of a deficiency of $9,719 in Federal income tax, a penalty of $486, and interest as provided by law. On November 23, 1998, respondent assessed those amounts as well as interest accruals thereon. (We shall refer to those assessed amounts as well as interest as provided by law accrued after November 23, 1998, as petitioner's unpaid liability for 1995.)

Petitioner did not enter into an installment agreement or other arrangement to pay petitioner's unpaid liability for 1995. Nor did petitioner at any time attempt to borrow money on an unsecured or secured basis in order to pay petitioner's unpaid liability for 1995.

On March 26, 1999, petitioner filed with respondent Form 8857, Request for Innocent Spouse Relief (And Separation of Liability and Equitable Relief), with respect to petitioner's unpaid liability for 1995. (We shall refer to Form 8857 that petitioner filed with respondent as petitioner's Form 8857.) Petitioner attached the following statement to petitioner's Form 8857:

> TO WHOM IT MAY CONCERN:
>
> I am submitting this form because I am qualified in every way for equitable relief.
>
> I and my spouse have no community property. What property I do have is an inheritance from my parent's estate.
>
> My husband runs his own business and is self-

employed. I myself have no knowledge whatsoever of his business dealings, in particular his stock transactions. Further, I have never been involved in any of his business dealings.

The only reason I signed the joint tax return in the first place was because his accountant thought it would be more convenient for him to file a joint return.

On September 10, 1999, in response to petitioner's Form 8857, respondent's Joint Compliance Branch sent petitioner a letter (respondent's September 10, 1999 letter to petitioner). That letter stated in pertinent part:

> Thank you for your request for Relief from Joint and Several Liability (Form 8857) received March 26, 1999.
>
> **[X]** Please complete the enclosed Form 886-A, Relief from Joint and Several Liability Questionnaire.[1]
>
> The additional information should be returned within **30** days from the date of this letter.
>
> If you have any questions, you may write to us at the address shown above, or you may call the above listed number. This is **not a toll-free number**.
>
> Thank you for your cooperation.
>
> [1]The record does not contain a copy of the "Relief from Joint and Several Liability Questionnaire" (questionnaire) to which respondent's September 10, 1999 letter to petitioner referred.

Petitioner did not return a completed questionnaire to respondent, nor did she otherwise respond to respondent's September 10, 1999 letter to petitioner.

On September 10, 1999, respondent's Joint Compliance Branch also sent Mr. Mellen a letter (respondent's September 10, 1999

letter to Mr. Mellen).  That letter stated in pertinent part:

> This is to inform you that Carolyn Mellen, who filed a
> joint return with you for the tax year(s) shown above,
> has requested relief from joint and several liability
> under section 6015 * * *
>
> If we grant the requested relief, you alone will be
> solely liable for all or a portion of the tax liabil-
> ity.  That is, the IRS may only collect the balance due
> from you.  To insure the proper determination of who
> pays the balance owed, you may want to participate in
> the IRS proceedings by providing any of the following
> information by October 15, 1999.
>
> > 1.  Whether Carolyn Mellen knew or had rea-
> >     sons to know of the audit adjustments
> >     and/or the balance due on the income tax
> >     return(s) for the above tax period(s)
> >     when he/she signed the return(s).
> >
> > 2.  The current marital status between you
> >     and Carolyn Mellen * * *
> >
> > 3.  Whether Carolyn Mellen significantly
> >     benefited from the unpaid liability.
> >
> > 4.  Why it would be fair or unfair to hold
> >     Carolyn Mellen liable for the tax lia-
> >     bility.
>
> Please provide specific details and appropriate docu-
> mentation that support your information. * * *

Mr. Mellen did not respond to the foregoing letter.[9]

On October 29, 1999, respondent's Joint Compliance Branch

sent petitioner another letter (respondent's October 29, 1999

letter).  That letter stated in pertinent part:

_____

[9]Although Mr. Mellen did not respond to respondent's Septem-
ber 10, 1999 letter to Mr. Mellen, in a letter dated Dec. 19,
1999, entitled "TRANSFER TO APPEALS REQUEST", Mr. Mellen re-
quested that the examination of the 1994 joint return be trans-
ferred to an IRS Appeals officer (Appeals officer).

We have determined that:

    [X] You are not entitled to relief from the under-
statement of tax liability as an innocent spouse.

    [X] Explanation for why relief was not granted:
You have not provided any information to show what the
exam issues were and that you did not know or have any
reason to know of the basis for the understatement of
tax.

If you want to appeal our decision, you must provide a
statement why you disagree with our decision.  We have
provided space at the end of this letter for you to
provide your statement of disagreement.  If that space
is not adequate, you may attach a separate statement
with a copy of this letter. * * *

On November 5, 1999, petitioner returned to respondent

respondent's October 29, 1999 letter and indicated in the space

provided in that letter for petitioner's statement of disagree-

ment (petitioner's statement of disagreement) that she disagreed

with respondent's determination that she was not entitled to

relief under section 6015.  In support of her disagreement,

petitioner asserted in pertinent part:

    I, Carolyn Mellen, disagree with the above IRS decision
    because:  As I notified you previously, I have NO
    knowledge of my husband's stock purchases or capital
    gains for the 1995.  [sic]  I can provide a copy of my
    W-2 form for that year, which I'm sure you probably
    already have.  That was the total amount of my earn-
    ings.  I had no benefit from any stock or capital
    gains.  I believe the audit was a result of stock &
    capital gains concerns and not my measly income.  I do
    not know what papers I was to provide for this investi-
    gation.*  To my knowledge, I submitted everything I was
    asked to provide.  I'm sure, if necessary, I can get a
    tax attorney to review my situation.

    Any further inquiries can be made by calling me at 325-
    5774 (801).[1]

\*    \*    \*    \*    \*    \*    \*

\*Was a letter sent asking for specific info?  If so, I did not receive it.

[1]The following handwritten notation appeared in the margin of petitioner's statement of disagreement near the telephone number that petitioner provided therein:  "Disconnected called 11/9/00".  The record does not disclose who made that notation.  The telephone number at which petitioner indicated "Any further inquiries can be made by calling" was petitioner's office telephone number at Questar.

On February 14, 2000, respondent sent petitioner and Mr. Mellen a notice of intent to levy with respect to taxable year 1995.  On March 24, 2000, in response to that notice, petitioner sent respondent a letter.  That letter stated in pertinent part:

I have filed for Innocent Spouse Relief for this particular year and was told that since a decision is still pending and is in Appeals Court [sic], no action should be taken against me or my property.

My husband was ill advised as to how to file taxes for the year 1995.  He should not have filed a joint return, and I would not have to appeal this matter.  I have a W-2 that specifically shows what money I earned for 1995.  I in no way had anything to do with his capital gains.

On November 14, 2000, an Appeals officer met with petitioner (November 14, 2000 hearing) for at least 30 minutes and no more than one hour.  The purpose of that hearing was to discuss petitioner's request for equitable relief under section 6015(f).  At the November 14, 2000 hearing, the Appeals officer questioned petitioner, and petitioner had the opportunity to present information including documentation, with respect to her claim for

equitable relief under section 6015(f).  Although petitioner knew prior to the November 14, 2000 hearing that the Appeals officer wanted to discuss with her the reasons why she believed that she was entitled to equitable relief under section 6015(f), petitioner did not bring with her to that hearing any documentation supporting her position that she was entitled to such relief.

The Appeals officer considered all of the information that petitioner shared with him during the November 14, 2000 hearing. As reflected in respondent's administrative record pertaining to petitioner (respondent's administrative record) which the Appeals officer created and/or on which he relied in arriving at his determination that petitioner was not entitled to equitable relief under section 6015(f), petitioner informed the Appeals officer at that hearing that as of the date of that hearing: (1) She was "still married to her husband, Craig Mellen, with whom she filed the joint 1995 Form 1040"; (2) she "signed the 1995 Form 1040 because her husband told her that that is what the accountant wanted" but had "never met the accountant"; (3) she "prepared her own income tax returns when she filed income tax returns separately from her husband" and "did not use a paid return preparer for completing or filing these income tax returns"; (4) she "has been working for eleven years"; (5) she "and her husband support the household"; (6) "her husband pays the mortgage payments to their home with his disability income";

(7) "her salary was about $2,700 a month in November of 2000"; (8) "she has a married daughter that helps out with the family expenses by contributing a couple hundred dollars a month"; (9) "her husband has had two major accidents, which have left his legs unusable"; (10) "her husband is not working, and * * * receives less than $900 a month in disability income"; (11) "her husband was an inventor in 1995"; (12) "her husband changed careers from the roofing industry to the invention industry in about 1990"; (13) "she has lived in her present house since about 1987"; (14) "her house is worth about $300,000"; (15) "as of November of 1995, she and her husband owed approximately $15,000 on the only mortgage on the house" and "she had a 15-year mortgage, and * * * it would be paid off in a couple of years"; (16) "her assets are in a trust"; (17) "she really did not own anything other than the house"; (18) "she has not considered refinancing her house to pay off the tax liability"; (19) "the income she and her husband reported on their 1995 Form 1040 was largely lost in the stock market, but that she used some of it to pay for a wedding"; (20) "she pays taxes on her own wages, but * * * she does not feel she should pay her husband's taxes"; and (21) "her husband blames everyone else for his problems".

On November 17, 2000, the Appeals officer and Mr. Mellen spoke over the telephone with respect to, inter alia, peti-

tioner's request for equitable relief under section 6015(f).[10]

As reflected in respondent's administrative record, the Appeals officer summarized in pertinent part as follows his conclusions with respect to petitioner's claim for equitable relief under section 6015(f) in a document dated February 1, 2001, and entitled "Brief Narrative for Appeals Case Memo":

> The basis for the additional assessment was the casualty loss claimed in 1995. The casualty actually happened, and should have been claimed, in 1994. Craig Mellen was at work in his warehouse when it blew up. He was injured, and he lost a lot of his property. Carolyn Mellen knew about the accident, and helped her husband get through it. No reason was given as to why the casualty loss was not claimed in 1994. However, there was no tax liability in 1994.
>
> There are two tiers of conditions that must be met to grant innocent spouse relief under section 6015(f). Carolyn meets the seven conditions under tier one (also referred to as general requirements).
>
> A problem does exist, however, in meeting the factors under tier 2 (also known as local factors).
>
> There appear to be no factors weighing in favor of equitable relief for the requesting spouse.
>
> The following facts weighing against equitable relief are considered:
>
> > 1. The requesting spouse is still married to the taxpayer. They still live in the same house, and there is no indication of an imminent divorce. The requesting spouse works, and her husband collects disability income. The household expenses are shared with the income available.

---

[10]On at least one occasion after Nov. 17, 2000, the Appeals officer and Mr. Mellen discussed over the telephone Mr. Mellen's claims and/or concerns with respect to the 1994 joint return.

2. Knowledge of the event. The requesting spouse new [sic] of the accident that her husband was involved in. She also knew when it happened. In prior and subsequent years, she filled out her own tax returns in order to file separately. She appears to have the knowledge of when a deduction can be claimed.

3. Lack of economic hardship. The requesting spouse has indicated that the Service [sic] is in the process of garnishing her wages, and that will leave them in a position where they cannot pay their bills. However, the taxpayer also indicated that they are living in a $300,000 home which will be paid off in a couple of years. The taxpayers have not considered refinancing the home to pay the tax.

4. The additional liability is not solely due to the non-requesting spouse. Even though the casualty took place in the non-requesting spouse's work environment, the requesting spouse had benefit of the results of that work. She elected to file the joint return, knowing that the tax would be lower.

In conclusion, Carolyn meets the threshold requirements for equitable relief. She does not have any of the factors for equitable relief that are in her favor. It is recommended that Carolyn not be granted innocent spouse relief for 1995 under Section 6015(f).

On February 14, 2001, the IRS Appeals Office sent petitioner a determination letter regarding petitioner's claim under section 6015(f) with respect to taxable year 1995. That letter stated in pertinent part:

We're writing to tell you that we've made a decision about your November 5, 1999 request for innocent spouse relief under Section 6015(f) of the Internal Revenue Code.

\* \* \* \* \* \* \*

We've determined that, for the above tax year(s), we:

- cannot allow your request.

You had knowledge of the casualty loss and when it took place.  Your 1995 return was examined by the Internal Revenue Service, and you agreed to moving the loss from 1995 to 1994.

The schedule below shows any adjustments we've made to your account.

| Tax Period(s) | Amount of relief you requested | Amount of relief we could allow | Amount of tax remaining |
|---|---|---|---|
| * * * 1995 | [1]$10,205.00 | $0.00 | [1]$10,205.00 |

[1]The amount shown is the total of the Federal income tax of $9,719 and the penalty of $486 that respondent had assessed with respect to petitioner's taxable year 1995.

Petitioner and Mr. Mellen, both of whom were about 60 years old at the time of the trial in this case, own the residence in which they have been living since 1987.  (For convenience, we shall refer to the real property owned by petitioner and Mr. Mellen at which they have been living since 1987 as petitioner's residence.)  During the period from at least March 1999 until sometime during 2001, Jamie and her daughter Jessica were living in petitioner's residence.  During at least November 2000, Rick, Andrew, and Jamie's "significant other" Glen also were living in petitioner's residence.  Sometime during 2001, Jamie, Jessica, and Glen moved out of petitioner's residence.[11]

---

[11]Although petitioner advised the Appeals officer during the November 14, 2000 hearing that her daughter Jamie helped "out with the family expenses by contributing a couple hundred dollars a month" while Jamie and her daughter Jessica, inter alia, were living in petitioner's residence, those payments ceased sometime
(continued...)

Mr. Mellen was the general contractor for, and oversaw, the construction of petitioner's residence during the 1980s. Although petitioner and Mr. Mellen have been living in that residence since 1987, as of the time of the trial in this case, certain work on petitioner's residence remained unfinished, including completing the installation of gutters, certain stuccowork, certain cement work, certain sheetrock work in the garage, and certain landscaping in the backyard. The unfinished sheetrock work in the garage of petitioner's residence has prevented petitioner and Mr. Mellen from obtaining a certificate of occupancy for that residence. Without such a certificate of occupancy, the local authorities will not approve petitioner's residence for permanent, as opposed to temporary, power.

Since at least March 1999, petitioner and Mr. Mellen have had certain maintenance problems with petitioner's residence, including certain cracked ceramic tiles, certain leaky plumbing,[12] wood rot in certain windows, certain flooding and mildew problems in the basement, and a missing piece of flashing from the roof. As of the time of the trial in this case, Mr. Mellen had fixed the leaky plumbing in petitioner's residence,

---

[11](...continued)
during 2001 when Jamie, Jessica, and Glen moved out of petitioner's residence.

[12]The leaky plumbing in question caused certain sheetrock to rot.

but neither petitioner nor Mr. Mellen had repaired any of the other maintenance problems in that residence.

Petitioner's residence does not contain any item of personal property valued in excess of $800.[13] Petitioner does not own any sterling silverware, furs, coin collections, or a wedding ring.

For purposes of 2000 real property taxes, Salt Lake County, Utah (Salt Lake County), determined that the total market value of petitioner's residence consisting of the house and the land on which that house was located was $317,900.[14] For purposes of 2001 real property taxes, Salt Lake County determined that the total market value of petitioner's residence consisting of the house and the land on which that house was located was $310,100.[15]

At the time of the trial in the instant case, petitioner and Mr. Mellen owned petitioner's residence free and clear of any encumbrances. As of that time, petitioner had not attempted to obtain a loan secured by petitioner's residence in order to pay

---

[13]The only new piece of furniture in petitioner's residence was a couch that one of petitioner's sons purchased.

[14]Salt Lake County determined that, for purposes of 2000 real property taxes, the market values of the house and the .44 acres of land on which that house was located were $263,700 and $54,200, respectively, and the real property tax on petitioner's residence was $2,866.23.

[15]Salt Lake County determined that, for purposes of 2001 real property taxes, the market values of the house and the .44 acres of land on which that house was located were $255,900 and $54,200, respectively.

petitioner's unpaid liability for 1995.

Petitioner and Mr. Mellen owned free and clear of any encumbrances a 1991 Infiniti automobile, a 1988 Toyota truck,[16] and another truck that needed repair. At the time of the trial in this case, petitioner was driving her son's car because the 1991 Infiniti that she usually drove needed repair.

In addition to petitioner's unpaid liability for 1995, at the time of trial in the instant case, the debts of petitioner and/or Mr. Mellen were: (1) $14,000 to the State of Utah for State income tax with respect to the taxable year 1995, (2) a $545 judgment for a medical bill, (3) a debt in an undisclosed amount for money borrowed at an undisclosed time from the Questar retirement plan, and (4) $9,000 to the Questar retirement plan for a second loan that petitioner used sometime after the November 14, 2000 hearing with the Appeals officer but before the date of the trial in this case in order to make the final balloon payment with respect to the mortgage on petitioner's residence.[17]

---

[16]A neighbor gave the 1988 Toyota truck to Mr. Mellen at a time not disclosed by the record because it was not working, and the neighbor thought that Mr. Mellen might be able to make the repairs necessary for that truck to become functional.

[17]As of at least January 2002, petitioner had been unable to obtain another loan from the Questar retirement plan. That is because, since at least that time, the maximum number of outstanding loans permitted under the Questar retirement plan at any one time was two (i.e., one general loan and one residential loan).

OPINION

We review respondent's denial of relief under section 6015(f) for abuse of discretion.[18]  Butler v. Commissioner, 114 T.C. 276, 292 (2000).  Petitioner bears the burden of proving that respondent abused respondent's discretion in denying her relief under section 6015(f).[19]  See Jonson v. Commissioner, 118 T.C. 106, 125 (2002).

Section 6015(f) provides:

> SEC. 6015.  RELIEF FROM JOINT AND SEVERAL LIABILITY ON JOINT RETURN.
>
>      (f) Equitable Relief.--Under procedures prescribed by the Secretary, if--
>
>           (1) taking into account all the facts and circumstances, it is inequitable to hold the individual liable for any unpaid tax or any deficiency (or any portion of either); and
>
>           (2) relief is not available to such individual under subsection (b) or (c),
>
> the Secretary may relieve such individual of such liability.

---

[18]In so holding, we reject petitioner's contention in her opening brief, which she appears to abandon in her answering brief, that "the Commissioner's determination * * * is entitled to a presumption of correctness".  See Butler v. Commissioner, 114 T.C. 276, 292 (2000).

[19]In so holding, we reject petitioner's contention that sec. 7491(a) shifts the burden of proof to respondent in the instant case.  See Jonson v. Commissioner, 118 T.C. 106, 125 (2002).  In any event, the record establishes that respondent's examination of the 1995 joint return commenced in 1997.  See sec. 7491(a); Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727.

In the instant case, the parties agree that relief is not available to petitioner under section 6015(b) or (c), thereby satisfying section 6015(f)(2).[20]

We turn first to a dispute between the parties as to the scope of the record upon which we should determine whether respondent abused respondent's discretion in denying petitioner relief under section 6015(f). As we understand her position, petitioner contends that that record should include not only the information that petitioner presented to respondent during respondent's administrative consideration of petitioner's request for relief under section 6015(f) but also the additional information (petitioner's additional information) that petitioner presented at trial and that is part of the record in this case. Respondent counters that the Court should determine whether respondent abused respondent's discretion in denying petitioner relief under section 6015(f) only on the basis of the information that petitioner presented to respondent during respondent's administrative consideration of her request for that relief.[21]

---

[20]The Court's jurisdiction in this case is dependent upon sec. 6015(e)(1). See Ewing v. Commissioner, 118 T.C. 494, 496-497 (2002), Fernandez v. Commissioner, 114 T.C. 324, 330-331 (2000); Butler v. Commissioner, supra at 289-290.

[21]In this connection, respondent objected at trial, inter alia, to certain evidence as irrelevant and immaterial to the issue of whether respondent abused respondent's discretion in denying petitioner equitable relief under sec. 6015(f). We overruled respondent's objections and indicated that, in deter-
(continued...)

We need not resolve the foregoing dispute between the parties. That is because, based upon our examination of the entire record in this case, including petitioner's additional information that is part of the record established at trial, we find that petitioner has failed to carry her burden of showing that respondent abused respondent's discretion in denying her relief under section 6015(f) with respect to taxable year 1995.[22]

We initially address certain of the arguments that petitioner advances on brief, all of which we find to be without merit. To illustrate, petitioner argues on brief that

> a ruling in favor of the spouse [petitioner] does not
> mean the tax debt is forgiven or that it will never be
> paid. It only means that based upon the present facts
> and circumstances, it is not equitable to compel the
> requesting spouse [petitioner] to pay the tax debt in
> full at this time. * * * If an economic hardship is
> present, then Congress has declared that the present
> collection of the tax is to be suspended as to the

---

[21](...continued)
mining whether respondent abused respondent's discretion in denying that relief, we would give whatever weight we consider appropriate to the evidence to which respondent objected.

[22]In so holding, we have considered petitioner's contention that respondent did not fulfill what petitioner claims was respondent's responsibility to investigate and ascertain during the administrative consideration of petitioner's request for relief under sec. 6015(f) all of the facts and circumstances with respect to petitioner's claim for equitable relief under sec. 6015(f). Regardless of whether or not petitioner's contention has any merit, petitioner had the opportunity at trial to introduce admissible evidence into the record that established all of the facts which she claims respondent had a duty to investigate and ascertain and on which she relies in order to show that respondent abused respondent's discretion in denying her relief under sec. 6015(f).

requesting spouse [petitioner].

We reject petitioner's views regarding the nature of the relief from joint and several liability provided by section 6015. Relief under that section from joint and several liability is not, as petitioner alleges, the temporary suspension of such liability.  See sec. 6015.

By way of further illustration, petitioner argues on brief that Revenue Procedure 2000-15, 2000-1 C.B. 447 (Revenue Procedure 2000-15), which prescribes procedures that are to be used in determining whether an individual qualifies for relief under section 6015(f), "is fundamentally flawed in that it unduly limits the broad application of the statute seeking to provide tax collection relief to a spouse" and considers facts and/or circumstances that are "legally irrelevant" and inappropriate in this case.  We reject those arguments about Revenue Procedure 2000-15.

As directed by section 6015(f), respondent has prescribed procedures in Revenue Procedure 2000-15 that are to be used in determining whether an individual qualifies for relief under that section.  Section 4.01 of Revenue Procedure 2000-15 lists seven conditions (threshold conditions) which must be satisfied before the IRS will consider a request for relief under section 6015(f). Respondent concedes that those threshold conditions are satisfied in the instant case.  Where, as here, the requesting spouse

satisfies the threshold conditions, section 4.01 of Revenue Procedure 2000-15 provides that a requesting spouse may be relieved under section 6015(f) of all or part of the liability in question if, taking into account all of the facts and circumstances, the IRS determines that it would be inequitable to hold the requesting spouse liable for such liability.

Where, as here, the requesting spouse satisfies the threshold conditions set forth in section 4.01 of Revenue Procedure 2000-15, section 4.02 of that revenue procedure sets forth the circumstances, in any case where a liability reported in a joint return is unpaid, under which the IRS ordinarily will grant relief to that spouse under section 6015(f). In the instant case, the liability from which relief is sought arises from a deficiency. Therefore, section 4.02 of Revenue Procedure 2000-15 is not applicable here.[23] However, where, as here, the requesting spouse fails to qualify for relief under section 4.02 of that revenue procedure, the IRS may nonetheless grant the requesting spouse relief under section 4.03 of Revenue Procedure 2000-15. That section provides a partial list of positive and negative factors which respondent is to take into account in considering

_____

[23]Assuming arguendo that sec. 4.02, Rev. Proc. 2000-15, 2000-1 C.B. 448, were applicable in the instant case, petitioner would not qualify for relief under that section of that revenue procedure. That is because petitioner has failed to show that the circumstances set forth in sec. 4.02 of Revenue Procedure 2000-15 are present in the instant case.

whether respondent will grant an individual full or partial equitable relief under section 6015(f).  As Revenue Procedure 2000-15 makes clear, no single factor is to be determinative in any particular case, all factors are to be considered and weighed appropriately, and the list of factors is not intended to be exhaustive.  Rev. Proc. 2000-15, sec. 4.03, 2000-1 C.B. 447, 448.

We now turn to the application of section 4.03 of Revenue Procedure 2000-15 to the record established in the instant case. As pertinent here, section 4.03(1) of Revenue Procedure 2000-15 sets forth the following positive factors which weigh in favor of granting relief under section 6015(f):

> (a) <u>Marital status</u>.  The requesting spouse is * * * divorced from the nonrequesting spouse.

> (b) <u>Economic hardship</u>.  The requesting spouse would suffer economic hardship (within the meaning of section 4.02(1)(c) of this revenue procedure) if relief from the liability is not granted.

> (c) <u>Abuse</u>.  The requesting spouse was abused by the nonrequesting spouse, but such abuse did not amount to duress.

> (d) <u>No knowledge or reason to know</u>. * * * In the case of a liability that arose from a deficiency, the requesting spouse did not know and had no reason to know of the items giving rise to the deficiency.

> (e) <u>Nonrequesting spouse's legal obligation</u>.  The nonrequesting spouse has a legal obligation pursuant to a divorce decree or agreement to pay the outstanding liability.  This will not be a factor weighing in favor of relief if the requesting spouse knew or had reason to know, at the time the divorce decree or agreement was entered into, that the nonrequesting spouse would not pay the liability.

       (f) <u>Attributable to nonrequesting spouse</u>. The liability for which relief is sought is solely attributable to the nonrequesting spouse.

(We shall hereinafter refer to the positive factors set forth in section 4.03(1)(a), (b), (c), (d), (e), and (f) of Revenue Procedure 2000-15 as the marital status positive factor, the economic hardship positive factor, the abuse positive factor, the knowledge or reason to know positive factor, the legal obligation positive factor, and the attribution positive factor, respectively.)

      With respect to the marital status positive factor set forth in section 4.03(1)(a) of Revenue Procedure 2000-15, petitioner concedes that the marital status positive factor is not present in this case.

      With respect to the economic hardship positive factor set forth in section 4.03(1)(b) of Revenue Procedure 2000-15,[24]

---

[24]In determining whether a requesting spouse will suffer economic hardship, sec. 4.02(1)(c) of Revenue Procedure 2000-15, to which sec. 4.03(1)(b) of that revenue procedure refers, requires reliance on rules similar to those provided in sec. 301.6343-1(b)(4), Proced. & Admin. Regs. Sec. 301.6343-1(b)(4)(i), Proced. & Admin. Regs., generally provides that an individual suffers an economic hardship if the individual is unable to pay his or her reasonable basic living expenses. Sec. 301.6343-1(b)(4), Proced. & Admin. Regs., provides in pertinent part:

      (ii) <u>Information from taxpayer</u>. In determining a reasonable amount for basic living expenses the director will consider any information provided by the taxpayer including--

(continued...)

petitioner contends that that positive factor is present in this case.

Petitioner has established that as of the time of the trial in this case she and/or Mr. Mellen was liable for a $545 judgment for a medical bill. She has also shown that as of March 2002, Questar was deducting the following approximate amounts each month from her compensation: (1) $140 for Federal income tax, (2) $113 for State income tax, (3) $186 for Social Security tax, (4) $43 for Medicare tax, (5) $96 for health benefits, (6) $30

[24](...continued)
      (A) The taxpayer's age, employment status and history, ability to earn, number of dependents, and status as a dependent of someone else;

      (B) The amount reasonably necessary for food, clothing, housing (including utilities, home-owner insurance, home-owner dues, and the like), medical expenses (including health insurance), transportation, current tax payments (including federal, state, and local), alimony, child support, or other court-ordered payments, and expenses necessary to the taxpayer's production of income (such as dues for a trade union or professional organization, or child care payments which allow the taxpayer to be gainfully employed);

      (C) The cost of living in the geographic area in which the taxpayer resides;

      (D) The amount of property exempt from levy which is available to pay the taxpayer's expenses;

      (E) Any extraordinary circumstances such as special education expenses, a medical catastrophe, or natural disaster; and

      (F) Any other factor that the taxpayer claims bears on economic hardship and brings to the attention of the director.

for dental benefits, (7) $60 for reserved parking, (8) $52 for life insurance, (9) $5 for accident insurance, (10) $300 for a $14,000 debt owed to the State of Utah for State income tax with respect to taxable year 1995, (11) $17 for a legal service plan, (12) $168 on a loan from the Questar retirement plan, (13) $173 on a second loan from the Questar retirement plan, (14) $77 for a "Micro Computer 1" (the meaning of "Micro Computer 1" is not disclosed by the record), (15) $191 as a contribution to the Questar retirement plan, and (16) $8 for savings bonds. Furthermore, petitioner has shown that at least as of the time of the trial in this case, she was investing $50 a month in a mutual fund and had a balance in that mutual fund of $500. However, on the record before us, we find that petitioner has failed to establish the amounts of any other expenditures, let alone expenses that section 301.6343-1(b)(4), Proced. & Admin. Regs., indicates are to be considered in determining a reasonable amount for basic living expenses.[25]  We further find on the record

---

[25]In an effort to establish certain expenses that sec. 301.6343-1(b)(4), Proced. & Admin. Regs., indicates are to be considered in determining a reasonable amount for basic living expenses, petitioner proffered at trial certain documentary evidence. The documentary evidence that petitioner proffered consisted of nothing more than petitioner's self-serving summaries of expenses that she claims to have incurred. Respondent objected to the admission of that evidence pursuant to Fed. Rules of Evid. 802 and 1006. We sustained respondent's objections. Petitioner did not substantiate by reliable documentary evidence most of the expenses claimed in such summaries. To the extent that petitioner substantiated any such expenses by reliable

(continued...)

before us that petitioner has failed to persuade us that she would not be able to pay a reasonable amount for basic living expenses if she remained jointly and severally liable for petitioner's unpaid liability for 1995.[26]  The record before us establishes that petitioner, inter alia:  (1) Has been employed

---

[25](...continued)
documentary evidence, we have found that she established such expenses.

[26]In attempting to persuade us that she would not be able to pay a reasonable amount for basic living expenses if she were not granted relief under sec. 6015(f), petitioner advances various contentions, all of which we find to be without merit.  To illustrate, petitioner appears to contend that the $545 judgment obtained for an unpaid medical bill, which judgment remained unsatisfied as of the time of the trial herein, shows that she has been unable to pay a reasonable amount for basic living expenses.  However, petitioner testified that the underlying medical bill with respect to which the $545 judgment in question was obtained "has been paid off."  Petitioner apparently disputes the validity of the $545 judgment in question and therefore has refused to pay it.  On the record before us, we find that petitioner's testimony does not establish that petitioner has been unable to pay the $545 judgment in question.

By way of further illustration, petitioner contends on brief that petitioner's "telephones had been disconnected for three (3) months", the implication being that petitioner was not able to afford to pay her telephone bill.  To support her contention regarding her inability to pay her telephone bill for 3 months, petitioner relies on the notation "Disconnected called 11/9/00" that appeared in the margin of petitioner's statement of disagreement with respect to respondent's October 29, 1999 letter stating that she was not entitled to relief under sec. 6015(f). We reject the inference that petitioner attempts to draw from that notation.  The record establishes that the number shown in petitioner's statement of disagreement was petitioner's telephone number at Questar, and not her home telephone number.  Furthermore, petitioner's contention that "telephones had been disconnected for three (3) months" is not supported by any evidence in the record.

by Questar since 1989; (2) was earning annual compensation of $38,160 at the time of the trial in this case; (3) contributed regularly each pay period to the Questar retirement plan; (4) invested monthly in a mutual fund; (5) invested regularly each pay period in savings bonds; (6) has undisclosed assets in a trust; and (7) has an inheritance from her "parent's estate". The record also establishes (1) that at the time of the trial in this case Mr. Mellen was receiving monthly SS disability benefits of $949 and was entitled as of April 1999 to hospital insurance under Medicare, (2) that petitioner and Mr. Mellen owned petitioner's residence and their automobiles free and clear of any encumbrances, (3) that petitioner's residence had an assessed market value of $317,900 in 2000 and $310,100 in 2001, and (4) that petitioner has not attempted to obtain a loan secured by petitioner's residence in order to pay petitioner's unpaid liability for 1995.

On the record before us, we find that petitioner has failed to carry her burden of establishing that the economic hardship positive factor set forth in section 4.03(1)(b) of Revenue Procedure 2000-15 is present in the instant case.

With respect to the abuse positive factor set forth in section 4.03(1)(c) of Revenue Procedure 2000-15, petitioner concedes that that positive factor is not present in the instant case.

With respect to the knowledge or reason to know positive factor set forth in section 4.03(1)(d) of Revenue Procedure 2000-15, petitioner does not dispute that that positive factor is not present in the instant case. Instead, she argues that that factor is "legally irrelevant" to determining whether she is entitled to equitable relief under section 6015(f). We disagree. We find that whether a spouse requesting relief under section 6015(f) knew or had reason to know of the item giving rise to a deficiency is a relevant factor in determining whether such spouse is entitled to such relief.

With respect to the legal obligation positive factor set forth in section 4.03(1)(e) of Revenue Procedure 2000-15, on the record before us, we find this factor to be a neutral factor in the instant case. That is because at all relevant times petitioner and Mr. Mellen were married.

With respect to the attribution positive factor set forth in section 4.03(1)(f) of Revenue Procedure 2000-15, petitioner contends that that positive factor is present in this case because "It was Craig Mellen's activities (i.e. the fire and the subsequent explosion) that generated a casualty loss." We agree with petitioner. The claimed casualty loss deduction of $30,930 in the 1995 joint return is the item that gave rise to the deficiency for 1995 (and the resulting unpaid liability for 1995), and that claimed deduction was attributable to the July

15, 1994 accident in which Mr. Mellen's property was damaged or destroyed. On the record before us, we find that petitioner has carried her burden of establishing that the attribution positive factor set forth in section 4.03(1)(f) of Revenue Procedure 2000-15 is present in the instant case.

Turning to the negative factors weighing against granting relief under section 6015(f) set forth in section 4.03(2) of Revenue Procedure 2000-15, as pertinent here, those factors are:

(a) <u>Attributable to the requesting spouse</u>. The unpaid liability or item giving rise to the deficiency is attributable to the requesting spouse.

(b) <u>Knowledge, or reason to know</u>. A requesting spouse knew or had reason to know of the item giving rise to a deficiency * * *. This is an extremely strong factor weighing against relief. Nonetheless, when the factors in favor of equitable relief are unusually strong, it may be appropriate to grant relief under § 6015(f) * * * in very limited situations where the requesting spouse knew or had reason to know of an item giving rise to a deficiency.

(c) <u>Significant benefit</u>. The requesting spouse has significantly benefitted (beyond normal support) from the unpaid liability or items giving rise to the deficiency. * * *

(d) <u>Lack of economic hardship</u>. The requesting spouse will not experience economic hardship (within the meaning of section 4.02(1)(c) of this revenue procedure) if relief from the liability is not granted.

(e) <u>Noncompliance with federal income tax laws</u>. The requesting spouse has not made a good faith effort to comply with federal income tax laws in the tax years following the tax year or years to which the request for relief relates.

(f) <u>Requesting spouse's legal obligation</u>. The requesting spouse has a legal obligation pursuant to a

divorce decree or agreement to pay the liability. (We shall hereinafter refer to the negative factors set forth in section 4.03(2)(a), (b), (c), (d), (e), and (f) of Revenue Procedure 2000-15 as the attribution negative factor, the knowledge or reason to know negative factor, the significant benefit negative factor, the economic hardship negative factor, the noncompliance negative factor, and the legal obligation negative factor, respectively.)

The parties do not dispute that the knowledge or reason to know negative factor, the economic hardship negative factor, and the legal obligation negative factor set forth in section 4.03(2)(b), (d), and (f), respectively, of Revenue Procedure 2000-15 are the opposites of the knowledge or reason to know positive factor, the economic hardship positive factor, and the legal obligation positive factor set forth in section 4.03(1)(d), (b), and (e), respectively, of that revenue procedure. We also note that the parties do not dispute that the attribution negative factor set forth in section 4.03(2)(a) of Revenue Procedure 2000-15 is essentially the opposite of the attribution positive factor set forth in section 4.03(1)(f) of that revenue procedure.[27]

---

[27]Although we do not believe that those two factors are exactly opposite because, inter alia, the attribution negative factor does not contain the word "solely" that appears in the attribution positive factor, we conclude that respondent's use of
(continued...)

With respect to the attribution negative factor set forth in section 4.03(2)(a) of Revenue Procedure 2000-15, we found above that petitioner carried her burden of establishing that the attribution positive factor set forth in section 4.03(1)(f) of that revenue procedure is present in the instant case. On the record before us, we further find that petitioner has carried her burden of establishing that the attribution negative factor set forth in section 4.03(2)(a) of Revenue Procedure 2000-15 is not present in the instant case.

With respect to the knowledge or reason to know negative factor set forth in section 4.03(2)(b) of Revenue Procedure 2000-15, we indicated above that petitioner does not dispute that the knowledge or reason to know positive factor set forth in section 4.03(1)(d) of that revenue procedure is not present in the instant case. Nor does petitioner dispute that the knowledge or reason to know negative factor set forth in section 4.03(2)(b) of that revenue procedure is present in the instant case. Instead, petitioner contends, as she does with respect to the knowledge or reason to know positive factor, that the knowledge or reason to know negative factor is "legally irrelevant" to resolving whether petitioner is entitled to relief under section 6015(f). We found

27(...continued)
the word "solely" in describing the attribution positive factor but not in describing the attribution negative factor does not affect our findings and conclusions with respect to those factors in the instant case.

above and restate here that whether a spouse requesting relief under section 6015(f) knew or had reason to know of the item giving rise to a deficiency is relevant in determining whether such spouse is entitled to such relief.

With respect to the significant benefit negative factor set forth in section 4.03(2)(c) of Revenue Procedure 2000-15 (i.e., whether the requesting spouse has significantly benefited beyond normal support from the unpaid liability or item giving rise to the deficiency), petitioner contends on brief that she did not significantly benefit from the item giving rise to the deficiency because it "did not significantly increase her wealth, her standard of living, or provide any meaningful benefit in excess of the support she is otherwise entitled to receive from her spouse under state law."

We find on the instant record that petitioner has failed to establish the amount that she and Mr. Mellen expended annually for their normal support during 1994, 1995 (the year to which the unpaid liability at issue relates), and thereafter. Nonetheless, it is reasonable to assume that the amount that they expended annually for such support during 1994 and 1997 through 2001 did not exceed their annual net income (i.e., the total of peti-tioner's net compensation from Questar, Mr. Mellen's disability benefits, and any interest, dividends, and other income disclosed

by the record) for each such year (annual net income).[28]  During

the period 1994 and 1997 through 2001, the record establishes

that the annual net income that petitioner and Mr. Mellen re-

ceived ranged from approximately $17,000 to $38,500.

The claimed casualty loss deduction of $30,930 gave rise to

a deficiency of $9,719 for taxable year 1995.  By not paying that

$9,719 of Federal income tax, petitioner and Mr. Mellen had an

additional $9,719 of funds available to spend.  The deficiency of

$9,719 attributable to the casualty loss deduction that peti-

tioner and Mr. Mellen claimed for taxable year 1995 ranged from

approximately 25 percent to 57 percent of the annual net income

of petitioner and Mr. Mellen during the period 1994 and 1997

through 2001.  We find that, by not paying the Federal income tax

of $9,719 attributable to the claimed casualty loss deduction in

question, petitioner and Mr. Mellen had funds available to them

(i.e., $9,719) substantially in excess of their normal support,

which we assume did not exceed their annual net income for each

---

[28]We have not made any such assumption regarding 1995 or
1996.  We have not done so with respect to 1995 because peti-
tioner testified that "the income she and her husband reported on
their 1995 Form 1040 [i.e., petitioner's compensation from
Questar of $22,691, taxable interest of $35, dividend income of
$19,152, and Schedule D capital gain of $500,755] was largely
lost in the stock market, but that she used some of it to pay for
a wedding".  We have not made any assumption with respect to 1996
about the amount that petitioner and Mr. Mellen expended for
their normal support during that year.  That is because the
record is devoid of any financial information relating to peti-
tioner and Mr. Mellen for that year.

of the years 1994 and 1997 through 2001.

On the record before us, we find that petitioner has failed to persuade us that she did not significantly benefit beyond normal support from the $9,719 of Federal income tax not paid for taxable year 1995. On that record, we further find that petitioner has failed to carry her burden of establishing that the significant benefit negative factor set forth in section 4.03(2)(c) of Revenue Procedure 2000-15 is not present in the instant case.

With respect to the economic hardship negative factor set forth in section 4.03(2)(d) of Revenue Procedure 2000-15, we found above that petitioner failed to carry her burden of establishing that the economic hardship positive factor set forth in section 4.03(1)(b) of that revenue procedure is present in the instant case. On the record before us, we further find that petitioner has failed to carry her burden of establishing that the economic hardship negative factor set forth in section 4.03(2)(d) of Revenue Procedure 2000-15 is not present in the instant case.

With respect to the noncompliance negative factor set forth in section 4.03(2)(e) of Revenue Procedure 2000-15, petitioner contends that she "has filed all federal income tax returns required of her since she entered the work force after her graduation from high school" and that "She has paid all federal

income tax liabilities that she owes, but for the single tax year in question." The parties stipulated that "For tax years * * * 1996 through 2000, petitioner filed income tax returns". Respondent does not contend that petitioner did not pay any Federal income tax shown due in each such return. With respect to taxable year 2001, the record contains an unsigned Form 1040 for that year.[29] On the record before us, we find that petitioner has established that she has made a good faith effort to comply with the Federal income tax laws following taxable year 1995. We further find on that record that petitioner has carried her burden of establishing that the noncompliance negative factor is not present in the instant case.

With respect to the legal obligation negative factor set forth in section 4.03(2)(f) of Revenue Procedure 2000-15, we found above that the legal obligation positive factor set forth in section 4.03(1)(e) of Revenue Procedure 2000-15 is a neutral factor in the instant case. On the record before us, we further find that the legal obligation negative factor set forth in section 4.03(2)(f) of that revenue procedure is a neutral factor in the instant case.

On the record before us, we find that petitioner has failed to carry her burden of establishing any other factors with

_____

[29]The record does not establish that petitioner had filed the unsigned Form 1040 for 2001 as of May 14, 2002, the date of the trial in this case.

respect to the year at issue that are not set forth in Revenue Procedure 2000-15 and that weigh in favor of granting her relief under section 6015(f).

Based upon our examination of the entire record before us, we find that petitioner has failed to carry her burden of showing that respondent abused respondent's discretion in denying her relief under section 6015(f) with respect to taxable year 1995.

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

Decision will be entered for respondent.